# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**NEW MEXICO CATTLE GROWERS
ASSOCIATION,** a nonprofit organization
on behalf of itself and its members, **NEW MEXICO
PUBLIC LANDS COUNCIL**, a nonprofit corporation
on behalf of itself and its members,  **NEW MEXICO
WOOL GROWERS, INC.,**  a nonprofit corporation
on behalf of itself and its members, **NEW MEXICO
FARM & LIVESTOCK BUREAU**, a nonprofit
corporation on behalf of itself and its members,  **NEW
MEXICO WHEAT GROWERS ASSOCIATION**,
a nonprofit corporation on behalf of itself and its members,
**PRODUCTION CREDIT ASSOCIATION OF NEW
MEXICO, COALITION OF ARIZONA,**  and **NEW
MEXICO COUNTIES FOR STABLE ECONOMIC
GROWTH,**  a nonprofit organization on behalf of itself
and its members, and **HIDALGO COUNTY CATTLE
GROWERS ASSOCIATION**, a nonprofit organization
on behalf of itself and its members,

$\qquad\qquad\qquad\qquad\qquad\qquad$ **Plaintiffs,**

v. $\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ **CIV. No. 98-0275 LH/DJS-ACE**

**UNITED STATES FISH AND WILDLIFE SERVICE,**
an agency of the United States Department of the Interior,
**BRUCE BABBITT**, Secretary of the United States
Department of the Interior, **JOHN ROGERS,**  United
States Fish and Wildlife Service Director, and Fish and
Wildlife Service Regional Director, and  **NANCY
KAUFMAN**, Southwest Regional Director, United States
Fish and Wildlife Service,

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' Motion to Strike Standing Argument, or in the Alternative, Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Standing[1] (Docket No. 46). The Court, having considered the briefs of the parties and the relevant caselaw, and being fully advised in the premises, for the reasons that follow, concludes that Plaintiffs have standing and that their motion shall be **granted.**

Further, as set forth below, two related motions, Federal Defendants' Motion and Memorandum to Strike Plaintiffs' April 15, 1999 Extraneous Legal Argument and Exhibits Thereto (Docket No. 65) and Plaintiff's Motion to Strike Declaration of Jamie Rappaport Clark and Attachments Thereto (Docket No. 48), shall be **denied**.

Finally, the Court has considered Plaintiffs' Opening Brief (Docket No. 25) and all related briefs, caselaw and exhibits. For the reasons that follow, I conclude that, on the merits, the actions of the United States Fish and Wildlife Service do not violate the Endangered Species Act, the National Environmental Policy Act or the Administrative Procedures Act, and that these actions shall be upheld and **affirmed.** A Final Judgment will be filed contemporaneously and in conformity with this Memorandum Opinion and Order.

## I.  Background

The U.S. Fish and Wildlife Service ("FWS" or "the Service") published its Proposed Rule to List the Southwestern Willow Flycatcher As Endangered With Critical Habitat on July 23,

---

[1]Defendants initially challenged Plaintiffs' standing in the Federal Defendants' Response Brief to Plaintiffs' Opening Brief  (Docket No. 40, filed on January 1, 1999).

1993.  (Administrative Record ("AR") at 367).  That publication contained the first solicitation

for data and comments regarding listing and critical habitat designation.  *Id.*  The FWS ultimately

issued its Final Rule Determining Endangered Status for the Southwestern Willow Flycatcher on

February 27, 1995.  (AR at 3877).  That rule deferred the designation of critical habitat. (AR at

3897).  The FWS reopened the comment period for the critical habitat designation for a sixty (60)

day period.  *Id.*

The designation languished until March 20, 1997, when the United States District Court

for the District of Arizona ordered the FWS to designate critical habitat for the Southwestern

Willow Flycatcher ("SWF") within the next 120 days.  (AR at 4447).  The court subsequently

clarified its order, noting that the time frame was provided for the FWS to decide whether or not

to designate critical habitat.  *Id.*

On July 22, 1997, the FWS published a final rule designating critical habitat for the SWF.

*See* AR 4446.  FWS designated eighteen (18) critical habitat units totaling 599 river miles in

Arizona, California, and New Mexico  (AR at 4454).  In doing so, the FWS considered various

physical and biological features as essential to the conservation of the SWF and potentially

requiring special management considerations (AR at 4449).  These features yielded a description

of physical characteristics of critical habitat.  (AR at 4450).  The FWS selected the critical habitat

areas because they contain the remaining known flycatcher nesting sites, and/or formerly

supported nesting flycatchers, and/or have the potential to support nesting flycatchers.  *Id.* The

FWS identified activities that may adversely modify critical habitat (AR at 4452).[2]

---

[2]These include:  (1)  removing, thinning, or destroying riparian vegetation by biological means, including grazing;  (2)  surface water diversion or impoundment, groundwater pumping, or any other activity that may alter the quantity or quality or surface or subsurface water flows, and (3)  overstocking of livestock.

In its attempt to address economic impacts under the Endangered Species Act, *see* 16 U.S.C. § 1533(b)(2), and ecological, aesthetic, historic, cultural, economic, social, and health effects under the National Environmental Policy Act, *see* 40 C.F.R. § 1508.8, the FWS adopted a "baseline" which attributed all impacts to the listing of the SWF. In its June 1997 economic analysis, FWS purportedly measured economic effects based on changes in national income, and regional jobs and household income (AR at 4466), and found that the critical habitat designation would have no incremental effect beyond that caused by listing. The FWS published an Environmental Assessment ("EA") of the designation for the SWF on July 3, 1997, (AR at 4486), analyzing 3 alternatives (AR 4492-4497). On October 16, 1997, the FWS issued its Finding Of No Significant Impact ("FONSI")(AR at 4522-4523).[3]

This lawsuit was filed on March 6, 1998, when Plaintiffs filed a complaint contending that Defendants violated the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531, *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* and the Administrative Procedures Act ("APA"), 5 U.S.C. § 551, *et seq.,* with regard to critical habitat designation ("CHD" or "designation") for the SWF. Plaintiffs specifically make two claims. They contend that the FWS did not follow proper procedures pursuant to the ESA in the consideration of economic impacts and the best scientific data available, and that it improperly designated nonessential areas when it made the critical habitat designation. Second, Plaintiffs allege that the Service's environmental assessment ("EA") pursuant to NEPA was inadequate

---

[3]In this document, the FWS regional director concluded that designation of critical habitat for the SWF "does not constitute a major Federal action that would significantly affect the quality of the human environment, and the preparation of an environmental impact statement on this action is not required by Section 102(2) of the National Environmental Policy Act or its implementing regulations."

because the Service did not take a "hard look" at the impacts of designation, that it did not

address adequate alternatives, that it did not cooperate with state and local agencies, and that the

FWS "finding of no significant impact" was erroneous.

Defendants contend, contrary to Plaintiffs' claims set forth above, that FWS properly

evaluated economic impacts, taking an incremental approach that considers only impacts that

would not occur but for the CHD. FWS also argues that it correctly determined that, for the

SWF, there were no economic impacts solely attributable to designation of critical habitat,

because the SWF's scarce habitat was already protected for the conservation and recovery of the

species. Further, the FWS argues that the scope of the NEPA review was adequate, in

consideration of the impact of the designation. FWS summarizes that the critical habitat

designation was well-grounded in the record and supported by the best available information.

The FWS answered the complaint on May 22, 1998. On June 8, 1998, Magistrate Judge

Svet issued an "Initial Scheduling Order." On August 20, 1998, the Court approved the briefing

schedule proposed by the parties and issued an order mandating that the Federal Defendants file

the administrative record by August 31, 1998

The Federal Defendants filed the administrative record on August 30, 1998. The Plaintiffs

filed their objections to the administrative record on September 24, 1998, and the

Federal Defendants filed their Response to Plaintiffs' Objection on October 2, 1998.[4]

On November 12, 1998, Plaintiffs filed their Opening Brief. The Federal Defendants filed

a Response Brief on January 29, 1999, which included a Declaration of Jamie Rappaport Clark,

---

[4] As set forth in an Order filed contemporaneously with this Memorandum Opinion and Order, the Court has overruled Plaintiffs' objections to the Administrative Record.

Director of the Fish and Wildlife Service, and seven accompanying attachments. In addition, the Response Brief contained argument that the Plaintiffs lack standing to bring this case.   On March 1, 1999, Plaintiffs filed their Reply Brief. Part II of this Reply Brief included Exhibits 2-5 in support of their arguments in favor of standing. Plaintiffs also filed a Motion to Strike Standing Argument, or in the Alternative, Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Standing (Docket No. 46),  with accompanying attachments. Plaintiffs also filed a Motion to Strike the Declaration of Jamie Rappaport Clark (Docket No. 48).

On May 10, 1999, Defendants filed a motion to strike Plaintiffs' Exhibits 2-5 (Docket No. 65).[5] The gist of Defendants' argument is that Plaintiffs' Reply Brief contains irrelevant  material that  was not previously raised in Plaintiffs' initial brief on standing. Defendants seek to strike Plaintiffs' new argument as well as the accompanying Exhibits 2, 3, 4, and 5.

I will take this opportunity to address both parties' motions to strike mentioned above.

I note that several procedural irregularities have been incurred by both parties regarding the standing issue during the briefing process.  In the interest of considering all relevant information on the issue of standing, in the interest of fairness to both parties, and given that Defendants did not seek permission to file a surreply brief to rebut Exhibits 2-5, the Court will **deny** Defendants' motion to strike portions of Plaintiffs' Reply Brief and Exhibits 2-5.  The Court will consider all submitted portions of Plaintiffs' reply brief on the standing issue, including the tendered exhibits. As Defendants themselves noted at page 2 of their response to Plaintiffs' standing motion,  this Court will not generally consider issues raised for the first time in a reply

---

[5]This pleading is entitled "Federal Defendants' Motion and Memorandum to Strike Plaintiffs' April 15, 1999 Extraneous Legal Argument and Exhibits Thereto", (Docket No. 65).

brief, *except when those issues relate to jurisdictional requirements.*[6]   Further, I note that it is

within the Court's power to allow or require the Plaintiffs to supply, by amendment to the

complaint or by affidavits, further particularized allegations of fact deemed supportive of

Plaintiffs' standing.  *Warth v. Seldin*, 422 U.S. 490, 501-502 (1975).

In conducting its analysis, the Court will also consider the arguments relating to standing

contained  in the Defendants' Response Brief to Plaintiffs' Opening Brief (Docket No. 40)[7].

The issue of standing was raised as an affirmative defense in Defendants' Answer.  As

noted above, it was first argued in Defendants' Response Brief to Plaintiffs' Opening Brief.

Plaintiffs interpret this argument to be a "Motion to Dismiss", in part based upon a

characterization by Defendants at page 39 of their Response Brief.  Plaintiffs object to

Defendants' raising this issue in their Response Brief to Plaintiffs' Opening Brief, as violating the

Court's Provisional Discovery Plan.  Defendants subsequently deleted the characterization of their

arguments as being a "Motion to Dismiss"  via substitution of a revised page 39 (See

Docket No. 41).  Despite the deletion of this characterization, Plaintiffs filed pleadings in response

to a motion to dismiss, rather than pleadings seeking summary judgment on the issue.  Defendants

criticize this approach, contending that it is incumbent upon Plaintiffs to produce evidence

necessary to show that they have standing to pursue this litigation and that they have not done so.

---

[6]  Defendants cite the case of *Sadeghi v. Immigration & Naturalization Service*, 40 F.3d 1139, 1143 (10th Cir. 1994) for this proposition.

[7] Plaintiffs object to Defendants' raising this issue in Federal Defendants' Response Brief to Plaintiffs' Opening Statement, filed on January 29, 1999, on the grounds that it was not filed, in the form of a motion to dismiss, on or before September 30, 1998.  While this is technically correct, a late filing of a motion may not be allowed to override the ultimate necessity that this Court determine that it has jurisdiction, which it may do at any step of the proceedings, even during the appellate stage.  *See Sutton v. Utah State School for the Deaf and Blind,* 1999 WL 100895 (10th Cir. 1999).  It simply makes no sense to proceed to what could be a void decision on the merits, if there is a question raised as to the jurisdiction of the Court.

Given the procedural history of the case on the standing issue, the Court will proceed under a summary judgment standard. As requested by Plaintiffs, the Court will consider matters outside the pleadings, i.e., Exhibits 2-5, attached to their Reply Brief. Under FED.R.CIV.P.12(b), this mandates that the motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56."

I will next address the Plaintiffs' motion to strike the declaration of Jamie Rappaport Clark and the attached exhibits. Plaintiffs argue that this Court should not consider these materials because they are outside the Administrative Record and because they are "post hoc rationalizations". I am cognizant that generally, judicial review of agency action is limited to review of the record on which the administrative decision was based. *See, e.g., Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). The reviewing court can go outside the administrative record but should consider such evidence relevant to the substantive merits of the agency decision only for the limited purpose of background information or to determine whether the agency considered all the relevant factors. *See Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). Contrary to Plaintiffs' arguments, the Court is persuaded by Defendants' assertions that the declaration and attachments are part of the "whole record" as defined by section 706 of the APA, because they explain the decision making process and show the reasoning and basis of the agency's action. Furthermore, even if the declaration and its attachments should be interpreted as being outside the Administrative Record, I conclude that a review of them is justified to facilitate judicial review and a better understanding of the reasons for the agency's decision. *See Sierra Club v. Yeutter*, 911 F.2d 1405, 1421 (10th Cir. 1990).

Finally, as noted in this Memorandum Opinion and Order, this Court has taken the

declaration into consideration about ten times, a majority of the time in combination with a reference to the Administrative Record.  The Clark Declaration is cited as the  lone support only for these factual assertions:  1.  It is FWS's position that all of the designated habitat is currently utilized by the SWF for one of several purposes.  2.  The FWS rendered biological opinions on the effects of actions on this habitat with regard to impacts on *the species*, prior to and/or regardless of the critical habitat designation.  3.  There is nothing unusual or overreaching in this approach.  4.  The FWS claims that it did consider the 1996 Hull and Parker survey and their 1995 report.

While providing helpful background information and an explanation as to some of the relevant factors considered, none of the paragraphs of the declaration that I have cited accomplishes anything more than explain some of the steps taken by the agency, evidence of which is largely already in the administrative record proper.  I conclude that it is of greater judicial economy to consider these materials at this juncture, as opposed to remanding the case to the agency for further explanation.  Director Clark has admitted  that the "[t]he Service did not create any drafts or memoranda at that time that completely memorialized all of the information sources relied on by the Service in making the final critical habitat determination," and therefore, it was necessary to "provide further explanation of the basis for the Service's decision."   Clark Decl. at ¶ 2.  Plaintiffs have not articulated any valid reasons to strike the declaration or its attachment. In the same vein of liberality that has been afforded to Plaintiffs, by consideration of their last minute proffer of affidavits in favor of their standing arguments, the Court will consider Clark's Declaration and its attendant attachments.  I have properly relied upon Clark's Declaration as further explanation of the Administrative Record, but not as a substitute for it.  Consequently, I conclude that Plaintiffs' Motion to Strike Declaration of Jamie Rappaport Clark

and Attachments Thereto (Docket No. 48), shall be **denied**.

## II.  Standing

### A.  Introduction

The law of standing consists of both constitutional and prudential components.

As recognized by the Tenth Circuit, the determination of a plaintiff's standing is a "highly case-specific endeavor, turning on the precise allegations of the parties seeking relief." *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994).  While at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, at the summary judgment stage, the "plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)(*citation omitted*).  Plaintiffs have the burden to establish jurisdiction by demonstrating that they are a proper party to invoke judicial resolution of the dispute.  *United States v. Hays*, 515 U.S. 737, 743 (1995).  The key to standing is specificity of the injury. Whether looking to an individual plaintiff or an organizational plaintiff, statutory or constitutional standing, the principle inquiry looks for a direct and concrete injury.  *Sierra Club v. Morton*, 405 U.S. 727 (1972).

Under Article III of the Constitution, which limits federal courts to deciding "cases" or "controversies," a party must suffer an "injury in fact" from a governmental action.

> The party invoking federal jurisdiction bears the burden of establishing an actual or imminent injury that is concrete and particularized rather than conjectural or hypothetical; a causal connection that is "fairly traceable" to the conduct

complained of; and a likelihood of redressability in the event of a favorable decision.

*Catron County Bd. of Com'rs, New Mexico v. U.S. Fish and Wildlife Service*, 75 F.3d 1429, 1433 (10th Cir. 1996), *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

When an association is the plaintiff the same three elements apply. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An association has standing to sue even if it has not been injured itself, so long as the association's members satisfy the constitutional minimum of Article III. An association has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977), *quoted by Committee to Save Rio Hondo v. Lucero*, 102 F.3d 445, 447 n.3 (10th Cir. 1996).

Because the National Environmental Policy Act does not contain a private right of action for those seeking to enforce its procedural requirements, a plaintiff must rely on the Administrative Procedures Act as the basis for its action and, therefore, in addition to satisfying the constitutional standing requirements, a plaintiff must establish it has "suffer[ed] legal wrong" or that it is "adversely affected or aggrieved ... within the meaning of a relevant statute" by some final agency action. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883 (1990). To establish such an adverse effect under NEPA, Plaintiffs must establish they have suffered an injury in fact falling within the "zone of interests" protected by NEPA. *United States v. Students Challenging*

*Regulatory Agency Procedures*, 412 U.S. 669, 686 (1973), *cited by Committee to Save the Rio Hondo* at 448. *See also National Wildlife Fed'n*, 497 U.S. at 883.[8]

Defendants claim Plaintiffs' injuries are solely economic and therefore do not fall within the zone of interests of NEPA. (Fed. Defs' Resp. Brief to Pls' Opening Brief at 19). Plaintiffs argue that the Secretary's failure to comply with the mandates of NEPA constitutes final agency action for purposes of standing, and that their claims do indeed fall within the zone of interests protected by NEPA.

As a preliminary matter, I note that Plaintiffs meet the zone of interest test because they seek to protect their consumptive interests in the land and water at issue and to prevent environmental damage on other lands. NEPA was specifically intended to advance such interests. *See Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996). Further, Mr. Polley and Mr. Hutchinson, as members of and on behalf of the Coalition, declare that it is seeking to protect the interests of its members in preserving the aesthetic aspects, health and safety of the environment in which they live. NEPA was also intended to advance these interests. *Id. National Wildlife Fed'n*, 497 U.S. at 886. The zone of interests requirement is satisfied so long as the litigant's interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

---

[8]In *Bennett v. Spear,* 520 U.S. 154, 165 (1997), the Supreme Court recently held that the ESA citizen suit provision, with its broad language allowing "a person" to sue, negates the zone of interests test. Further, in the claims that the Supreme Court found were not to be covered by the ESA's citizen-suit provision, the Court found that petitioner's allegations under 16 U.S.C. § 1536(a)(2), that requires the agency to "use the best scientific and commercial data available," has the obvious purpose that each agency ensure that the ESA is not implemented haphazardly, on the basis of speculation or surmise. The Court noted that this advances the ESA's overall goal of species preservation, but also the objective of avoiding "needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 176-77. The Court concluded that economic consequences are an explicit concern of the Act, as evidenced by § 1536(h).

suit." *Clarke v. Securities Indus. Ass'n.,* 479 U.S. 388, 399 (1987).

Accordingly, I will turn to whether or not Plaintiffs have established standing to sue under Article III.

### B. Constitutional Standing

#### 1. Injury in fact

To suffer an injury in fact, the plaintiff must be among those injured by the action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). When the suit is one challenging the legality of government action or inaction and the plaintiff is himself an object of the action (or forgone action) at issue, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* I conclude that both the injury and redressability elements are met in this case.

In this case, Plaintiffs have alleged and substantiated injury in fact. For example, Mr. Fryar states that he owns federal grazing permits for land that has been designated as critical habitat for the SWF. He states that fencing has been erected and continues to be erected on both sides of the length of the Tularosa and San Francisco Rivers in this designated habitat area. This fencing has been done by the United States Forest Service, who has required him to participate in this fencing effort as well, at his own effort and expense. He estimates that due to the fencing, livestock will be excluded from approximately 775 acres of the allotments to which he is currently licensed. Due to the fencing, he has been forced to reduce the size of his herd and to concentrate it on his remaining allotted land, which he states has resulted in a reduction in the growth and health of his herd, as well as overgrazing, environmental damage on other lands, and loss of

income to him.  Furthermore, he states that he has an historic stock water right on both rivers and

that the fencing limits his access to river water which causes him significant inconvenience and

financial harm.  In addition, this necessitates him to use an agricultural water right that he also

owns to water his livestock.

This alleged injury to Mr. Fryar to use his full licensed allotment and water rights  is actual

and current.[9]   As a permittee of grazing rights on property that falls within the proposed critical

habitat designation, adversely affected by such designation, Mr. Fryar is the object of the FWS's

alleged failure to act in accordance with the ESA and NEPA. As noted by the Supreme Court in

the *Lujan* case cited above, because Mr. Fryar is an object of the governmental action here, there

can be little question that the governmental action has caused him injury.  For these reasons, I

conclude that, as a member of these associations, Mr. Fryar has established constitutional standing

for the New Mexico Cattle Growers Association, the New Mexico Public Lands Council and the

New Mexico Farm & Livestock Bureau.

Mr. McCarty also owns and operates  a livestock ranch in New Mexico.  He too states

that he owns federal grazing permits for land that has been designated as critical habitat for the

SWF.  In addition, Mr. McCarty accesses 160 acres of his private property via public grazing

allotments.  He states that the above-mentioned fencing, once complete,  will cut off the only

access he currently has to this 160 acre parcel of private property.  He also states that the fencing

will limit access of his livestock to river water for which he has historic water rights.  For the

---

[9]While I recognize that Mr. Fryar is a permittee and enjoys a certain limited  benefit in this capacity, I am also cognizant that his permit is a privilege which  may be withdrawn at any time for any use by the sovereign without the payment of compensation.  *Osborne v. United States*, 145 F.2d 892, 896 (9th Cir. 1944).   Grazing permits "convey no right, title, or interest held by the United States in any lands or resources."  36 C.F.R. § 222.3(b); 43 U.S.C. § 1752..  *See Diamond Bar Cattle Company v. United States*, 168 F.3d 1209, 1212 (10th Cir. 1999).

same reasons applicable to Mr. Fryar, I conclude that Mr. McCarty has established constitutional standing for the New Mexico Cattle Growers Association.

In Mr. Hutchinson's individual capacity, he states that he owns property with water rights that could be impaired by the declaration of critical habitat. He states that his aesthetic enjoyment, recreational opportunities and spiritual well-being have been adversely impacted by the declaration of critical habitat, partially due to anticipated reduced access to recreational areas and restrictions on camping.

Under the *Lujan v. Defenders of Wildlife* rationale, I conclude that these three men, as members of the New Mexico Cattle Growers Association, the New Mexico Public Lands Council and the New Mexico Farm & Livestock Bureau, have demonstrated these named Plaintiffs are objects of the action related to the critical habitat designation, leaving little question that the action has caused them injury.


### 2. Procedural Injury

A plaintiff does not meet the Article III "case or controversy" requirements by asserting a generalized grievance against the government that no more directly affects him than a member of the public at large. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-4 (1992). This proposition notwithstanding, the Supreme Court found that procedural rights are special. *See id.* at 573 n.7. Under the Supreme Court's example, a plaintiff living adjacent to a site for a proposed dam has standing to challenge an agency's failure to prepare an environmental impact statement ("EIS") without showing that the EIS will cause the dam license to be altered and even when the dam will not be completed for many years. *Id.* To establish such procedural standing,

a plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8. The Supreme Court did not clearly state how the typical standing test is altered under procedural standing analysis. It states, however, that a plaintiff need not meet all the usual standards for redressability and immediacy to establish its procedural standing. *Id.* at 573 n.7. Also, although the Supreme Court addressed the immediacy requirement of the injury-in-fact element and the redressability element, it did not address causation. Consequently, I consider it here under the usual standard: the plaintiff must demonstrate a procedural right designed to protect a concrete interest and that injury to the concrete interest is fairly traceable to the challenged action.

First of all, I conclude that the ESA gives the Plaintiff counties notice and an opportunity to comment on any change to the status of a species and that this accords them a procedural right. *See Coalition of Arizona et al v. DOI et al*, No. 94-1058 (D.N.M. Oct. 9, 1997).

In *Coalition of Arizona, et al.,* Judge Mechem analogized to *Douglas County v. Babbitt,* 48 F.3d 1495, 1501 (9th Cir. 1995), and found that the geographic nexus of the counties' lands to the affected adjoining lands establishes a concrete interest. As the Ninth Circuit stated,"[i]t is logical for the County to assert that its lands could be threatened by how the adjoining federal lands are managed." *Id.* In this case, designation of critical habitat may cause environmental harm to the counties' adjoining lands. The submitted declarations from Mr. Polley and Mr. Hutchinson evidence the Coalition's concrete interest underlying its procedural right.

The Coalition of Counties represents the interests of Catron County, which includes lands that have been designated as critical habitat for the SWF. On behalf of the Coalition, Mr. Polley states that if the number of livestock grazed within the County is reduced, County revenues will

be reduced. He states that grazing reductions of Forest Service land have been proposed to protect SWF and its critical habitat. Further, he states that the county's ability to maintain county roads through lands designated as critical habitat could be reduced or eliminated as a result of the designation, and if this happens, the welfare and safety of the people of Catron County will be adversely impacted.

Mr. Hutchinson also filed a declaration on behalf of the Coalition. He is the Executive Director of the Coalition and mentions its "high interest in riparian area restoration and maintenance", contending that the designation of critical habitat may "result in additional limitations in riparian areas, including imposition of minimum in-stream-flows and limitations of ground water pumping and disruption of maintenance or improvement of diversion structures, bridges, and roads." Decl. of Howard Hutchinson at ¶ 15. He states that this designation has hampered efforts for river bank stabilization, resulting in continued deterioration of riparian areas, increased down stream siltation, flooding and reduction of delivery of water. Finally, he states that this designation further impedes efforts to eradicate the invasion of the salt cedar.

Under the procedural injury analysis set out in *Lujan*, the immediacy requirement is relaxed. Thus, I find that Catron County, a member of the Coalition, has shown a sufficient concrete interest in the protection of its own land, even though the environmental threat may not be immediate or imminent.

Insofar as the causation element is concerned, I conclude that injury to these concrete interests is fairly traceable to the challenged action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Accordingly, Catron County has standing to pursue this action under the Supreme Court's procedural standing analysis. Because it has established the standing of at least

one member county, the Coalition must satisfy the remaining elements of the *Hunt* test to show its representative standing. First the interests the Coalition seeks to protect must be germane to its purpose. Mr. Polley's Declaration states that the Coalition represents the interests of Catron County in this case and that Catron County "has a significant interest in the human and natural environment in the County and its effects on the population and economy of the County. Catron County also has an interest in maintaining the local customs and culture within the County." *Id.* at ¶ 8. I find these interests germane to the interests that the Plaintiffs seek to protect in this action.

Next, the participation of individual members in this action is unnecessary. The Coalition adequately represents the interests of the member counties. Therefore, I find that in meeting the procedural standing requirements of *Lujan* and the representative standing requirements of *Hunt*, the Coalition has established its standing to sue in this case.


### 3. Redressability

Finally, Plaintiffs must demonstrate redressability. "The redressability prong of Article III standing analysis requires simply that the claimed injury 'is likely to be redressed by a favorable decision.'" *Humane Society of the United States v. Babbitt*, 46 F.3d 93, 96 (10th Cir. 1995). To satisfy the element of redressability, however, Plaintiffs need to show only plausibility. Plaintiffs need not indicate certainty, but only the likelihood (as opposed to speculation) that the injury will be redressed by a favorable decision. *Mount Evans Company v. Madigan*, 14 F.3d 1444, 1450 (10th Cir. 1994). I conclude that Plaintiffs have established the likelihood that the injury, as discussed above, would be redressed by the relief sought in their Complaint.

### III.  Standard of Review

In examining whether the FWS's actions violate the ESA, I rely on the standards of review provided in the APA.  *Biodiversity Legal Foundation v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998).  Under the APA, administrative decisions involving the ESA are upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law",  5 U.S.C. § 706(2)(A);  *see  Village of False Pass v. Clark*, 733 F.2d 605, 609-10 (9th Cir. 1984), or if they are "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).  As the Tenth Circuit has stated, "the essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion."  *Olenhouse v. Commodity Credit Corporation*, 42 F.3d 1560, 1574 (10th Cir. 1994)(*citations omitted*).  Under the arbitrary and capricious standard, the duty of a reviewing court is to "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made . . . .  In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment."  *Olenhouse*, 42 F.3d at 1574 (citation omitted).  More specifically, an agency action will be set aside "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id. (citing Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## IV. The Endangered Species Act

The Endangered Species Act, 16 U.S.C § 1531 *et seq.*, was enacted by Congress in 1973 in response to increasing concern about the extent to which "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C § 1531(a)(1). The purpose of the Act is "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. . ." 16 U.S.C § 1531(b).

Congress, in enacting the ESA, provided for the protection of endangered and threatened species and conservation of their ecosystems in a number of ways. First and foremost, the Secretary, through his delegated agency, the FWS, is authorized to identify species in need of protection. Section 4 of the Act, 16 U.S.C. § 1533, sets out the procedures for listing a species as either endangered or threatened. The FWS is to consider certain factors in this determination. *See* 16 U.S.C § 1533(a)(1). The Act specifically provides that this determination is to be made "solely on the basis of the best scientific and commercial data available..." 16 U.S.C § 1533(b)(1)(A).

Once a species is listed, certain protective mechanisms are triggered, regulating and prohibiting certain actions by both federal and non-federal entities. In addition to protections provided through listing of the species itself, Congress directed the Secretary to designate "critical habitat" for listed species. 16 U.S.C § 1533(a)(3).

The critical habitat designation process involves a two-part analysis. First, the Service identifies those areas with the physical and biological features essential to the conservation of the

species that are in need of special management.  The designation of "critical habitat" may include specific areas found "within" and/or "outside" the geographic area occupied by the species.  16 U.S.C § 1532(5)(A).  Congress defined critical habitat as those areas which contain "those physical and biological features essential to the conservation of the species" and which "may require special management consideration or protection" , 16 U.S.C  § 1532(5)(A)(i),  and provided that except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.  16 U.S.C  § 1532(5)(C).

The FWS is required to designate critical habitat "on the basis of the best scientific data available," and to consider "the economic impact, and any other relevant impact" of designating a particular area as critical habitat.  16 U.S.C  § 1533(b)(2).  The FWS conducts an economic analysis and examines the economic impacts caused by the designation.  The FWS has broad discretion to balance the economic impact of designation against the benefits, and may exclude a particular area if the Service determines "that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat," unless to do so would result in the extinction of the species.  16 U.S.C  § 1533(b)(2); 50 C.F.R. § 424.19.  In other words, after this two part analysis, the FWS is authorized, but not required, to exclude areas based upon its finding.

In addition, the  FWS must follow enumerated procedures for public notification and comment during the process of designating critical habitat.  16 U.S.C  § 1533(b)(4)-(6).

## A. Critical Habitat Designation for the SWF

The FWS provided a factual and procedural background of its critical habitat designation for the SWF at pages 6-13 of its Response Brief.

The ESA defines "critical habitat" as "the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  16 U.S.C. § 1532 (5)(A)(i).

## (1)  Examination of FWS's Assessment of Economic Impacts
### (a)  Incremental Approach to Designating Critical Habitat

Plaintiffs contend that FWS refused to assess the economics of its listing decision and that this approach  undermines Congress' directive to conduct economic analysis.  Pls. Memo. at 18.

The ESA requires the Secretary to make listing determinations "solely on the basis of the best scientific and commercial data available".  16 U.S.C.  § 1553(b)(1)(A).  The FWS contends that the Secretary is restricted to considering only biological factors when considering a listing, and cannot be influenced by economic impacts.  The FWS further contends that it has been its longstanding interpretation that Section 4(b)(2), which requires critical habitat designations, limits consideration of economic impacts to only those impacts that would not result but for the designation of critical habitat.  The FWS relies upon the clear language of the Act as well as its legislative history to support its "incremental approach" to measuring economic impacts.

> The addition of the word "solely" is intended to remove from the process of the listing or delisting of species any factor not related to the biological status of the species.  The committee strongly believes that economic considerations have no relevance to

> determinations regarding the status of species and intends that the economic analysis requirements of Executive Order 12291, and such statutes as the Regulatory Flexibility Act and the Paperwork Reduction Act not apply. . . . The only alternatives involved in the listing of species are whether the species should be listed as endangered or threatened or not listed at all. Applying economic criteria to the analysis of these alternatives and to any phase of the species listing process is applying economics to the determinations made under Section 4 of the Act and is specifically rejected by the inclusion of the word "solely" in this legislation.

H.R. Rep. No. 97-567, at 20 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2820. "The 1982 Amendments and their legislative history were emphatic that the listing process was to be an impartial and objective inquiry, free of economic or other extraneous considerations, ...." MICHAEL J. BEAN & MELANIE J. ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 206 (3rd ed. 1997).

FWS asserts that it is not ignoring the congressional directive to conduct economic analysis. Rather, FWS contends that it is not injecting economics into the listing determination, and yet consider economics in the critical habitat designation. Its position is that it must consider, not the total cost of conservation measures (*i.e.,* listing plus designation) that might take place within critical habitat, but only the incremental costs above those that would result even if critical habitat had not been designated.

I agree that this agency interpretation of the various statutory directives is a reasonable and permissible one under the ESA, and is due deference. *See Sierra Club v. U.S.E.P.A.*, 99 F.3d 1551, 1555 (10th Cir. 1996). The Service properly evaluated economic impacts in an incremental manner from those associated with listing, as is required under the ESA

### (b) FWS's Determination that Designation Results in No Incremental Economic Impact

Because the patches of habitat utilized by the species for its various needs were expected by FWS to shift over time, the FWS included in the designation entire reaches of the rivers in the critical habitat areas. (AR 4450; *See also* Clark Decl. at ¶ 5). I note that it is the FWS's position that all of the designated habitat is currently utilized by the SWF for one of several purposes. (Clark Decl. at ¶¶ 6, 20-21.)[10]

Once it determined what areas should be included in the designation, the FWS examined whether any incremental economic impact was caused by the designation and concluded that the designation would result in no additional protection for the SWF nor any additional economic effects, beyond those that may have been caused by the listing and by other statutes. (AR 4454; Clark Decl. at ¶¶ 12,18). The FWS contends that it carefully considered this critical habitat designation that included lands as provided under the ESA and appropriately assessed economic impacts in consideration of the specifics of this species and its habitat.

I have carefully reviewed the seven (7) pages of the FWS brief devoted to the explanation and justification for this contention, as well as opposing sections of Plaintiffs' two briefs, which include several criticisms of the areas designated. Plaintiffs' main argument is that the FWS's economic analysis was arbitrary because it could not have reasonably determined that actions that would trigger "adverse modification [to habitat]" review would already be under review pursuant

---

[10] I note that FWS's determination included breeding habitat to protect the species itself (regardless of the critical habitat designation.) AR 4449, Clark Decl. at ¶ 10. This is reasonable and entitled to due deference of this Court. Were FWS to take any other view, there would be no protection at all for any habitat of migratory species, which would rapidly be driven to extinction without protection of their breeding areas. *See, Northwest Forest Resource Council v. Pilchuck Audubon Soc.*, 97 F.3d 1161 (9th Cir. 1996)(Appellate court upheld protection of breeding stands for the marbled murrelet, a seabird that utilizes coastal areas periodically for breeding).

to the "jeopardy" standard. The FWS explains away this argument, in part with Director Clark's Declaration, which states that due to its critically endangered status, "all existing and potential habitat used by the southwestern willow flycatcher was considered essential to the species survival prior to the designation of critical habitat." *Id*. at ¶ 10. The FWS had determined that protection of existing and potential nesting habit was necessary to avoid "jeopardy" to the species, and so, when it used the Final Rule designating such habitat as part of the critical habitat, the FWS reasonably concluded that there would be no additional protection for flycatcher habitat, arising separately from the designation. (AR 4454; Clark Decl. at ¶¶ 12,18). Similarly, the FWS concluded that there would be no additional economic impacts above those associated with review under the "jeopardy" standard, as the habitat would already be subject to review to protect the species itself. *Id*.

Plaintiffs challenge this determination but can demonstrate no arbitrariness. For example, two areas they mention, along the San Francisco and Tularosa Rivers, were considered in Section 7 consultation to protect *the species*. The FWS rendered biological opinions on the effects of actions on this habitat with regard to impacts on *the species*, prior to and/or regardless of the critical habitat designation. Clark Decl. at ¶¶ 11-18. As described by Director Clark, there is nothing unusual or overreaching in this approach. Clark Decl. at ¶ 9. The importance of protecting habitat is recognized throughout the ESA; habitat status is the first factor to be considered in listing. 16 U.S.C. § 1533(a)(1)(A). It appears that Plaintiffs are dissatisfied with the listing of the species and with the federal land management's obligations to protect that species against activities that have resulted in its decline and current precarious status. This provides no basis for granting them relief.

Plaintiffs complain that the FWS failed to "quantify" the economic impacts to grazing permittees, and to engage in balancing of these alleged impacts.  In fact, the FWS conducted an adequate analysis, considered the existence of other habitat protections, reviewed economic effects on local communities, and noted that the economic output for cattle-raising alone was relatively minor in these communities.  (AR 4479-80).

The FWS urges that its determination that all proposed designated habitat should be included in the designation, is a reasonable one, because the FWS believes that the current and potential nesting habitat is so crucial to the survival and recovery of the species.  (AR 4449-4450; Clark Decl. at ¶¶ 4, 10).

I  conclude that the designation is based on reasonable interpretations of the ESA's requirements for critical habitat designation and on a clearly permissible construction of the statute.  Furthermore, the designation is based on expert scientific judgments of the FWS biologists--  precisely the type of judgments typically given deference by reviewing courts. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 843 (1984)(Court should defer to the agencies' interpretation of the statute, so long as it is "based on a permissible construction of the statute," especially where that construction is based on the agency biologists' expertise).  I conclude that Plaintiffs  have not demonstrated that the FWS action in this regard was arbitrary or capricious and note the enormous discretion provided the Secretary in making these decisions:  "The Secretary **may** exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in extinction of the

species concerned." 16 U.S.C. § 1533(b)(2)(emphasis added). As explained in the preamble to the regulations setting forth procedures for designating critical habitat at 50 C.F.R. § 424.19, "[i]t should be noted that this provision is permissive rather than prescriptive, and does not require exclusion of an area from critical habitat under any given set of circumstances." 49 Fed.Reg. 38900, 38907 (October 4, 1994).

### (c)  FWS Based the Critical Habitat Designation on the Best Scientific Data Available

Plaintiffs contend that the FWS failed to base its designation on the best scientific data available as required by 16 U.S.C. § 1533(b)(2).  Plaintiff argues that this  is true  because FWS did not consider a survey prepared by Hull and Parker in 1996.  Pls. Memo at 22.

The FWS claims that it did consider this survey and Hull and Parker's 1995 report.  Clark Decl. at ¶ 23.  Based upon the facts set forth in Director's Clark's Declaration, I conclude that the work of Hull and Parker and their opinions were before the FWS when it designated critical habitat for the SWF.  Also, I note that the primary assertion of these authors is that livestock grazing does not degrade the riparian habitat utilized by the SWF, and that this same opinion is contained in documents included in the record before me  (AR 2134).  Finally, the FWS claims that it found overwhelming scientific support to rebut this opinion.  For example, the FWS found that "[O]veruse by livestock has been a major factor in the degradation and modification of the riparian habitats in the western United States" (AR 3891), and that "[l]ivestock grazing in riparian habitats typically results in reduction of plant species diversity and density. . . ."  *Id.;  see also* Clark Decl. at ¶¶ 7, 24.  Moreover, the scientific data shows that "[i]ncreases in abundance of

riparian bird species have followed reduction, modification or removal of grazing." *Id.* The FWS

provided at least a dozen studies to support their decision on the effects of livestock grazing.

(AR 3892-93). In addition to the scientific support found in the final rule designating critical

habitat (AR 4446-7, 4452), the FWS addressed Hull and Parker's thesis in the 1995 Final Rule in

the Issues and Comments section (AR 3883-84; *see also* Clark Decl. at ¶ 24).

Finally, Director Clark addresses these conclusions, finding them to be "not fully

accepted" and that they are not necessarily relevant across the range of the SWF. *Id.*

I conclude that these two author's opinions were considered, but that based on

overwhelming evidence to the contrary, the FWS concluded that livestock grazing has a

detrimental effect on the habitat of the SWF. I grant this conclusion due deference, because the

FWS reasonably interpreted the evidence based on its substantial expertise, such evidence being

the "best scientific data". When specialists express conflicting views, an agency must have

discretion to rely on the reasonable opinions of its own qualified experts. *Marsh v. Oregon Nat.*

*Res. Council*, 490 U.S. 360, 378 (1989).


## V.  CHALLENGE UNDER NEPA TO THE FWS'S FONSI DETERMINATION

NEPA achieves its purposes by imposing procedural requirements that federal agencies

must follow in their decision-making process, to consider the environmental impacts of their

actions that may significantly affect the quality of the human environment. 42 U.S.C. § 4332.

Pursuant to NEPA, the FWS must prepare a "detailed statement on the environmental

impact" when it proposes major action.[11]  The detailed statement is referred to as an

Environmental Impact Statement (EIS).  The FWS may first prepare an Environmental

Assessment (EA) to analyze whether an EIS is required.  40 C.F.R. §§ 1501.4; 1508.9(a).[12] If the

EA determines that the action will not have significant effects, the agency issues a Finding of No

Significant Impact ("FONSI"), foregoing the EIS.  40 C.F.R. §§ 1501.4(c)-(e) and 1508.13.

Plaintiffs contend that the FWS (1) improperly determined that the environmental impacts

of designation were not significant and, therefore, did not require preparation of an EIS;  (2)

failed to consider the cumulative environmental impacts of designation;  (3)  analyzed an

insufficient range of alternatives; and (4)  failed to cooperate with state and local governments.

The  FWS argues that Plaintiffs' NEPA arguments are  simply a variance to the challenge, as

discussed above, to the FWS opinion that designation of critical habitat has little environmental

impact, if any, beyond listing of the SWF.

The FWS further argues that, based upon a review and evaluation of the information

contained in the EA (AR 4486) and the July 27, 1997 Final Determination of Critical Habitat, the

FWS regional director properly determined that "the preparation of an environmental impact

statement on this action is not required by section 102(2) of the National Environmental Policy

---

[11]  Although there is a split among the circuits, the Tenth Circuit held in *Catron County Board of Commissioners v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (10th Cir. 1996), that compliance with NEPA procedures is required when designating critical habitat.

[12]  IF NEPA requires preparation of any Environmental Impact Statement, the agency must examine:  the impacts of the proposed action; (1)  any adverse environmental effects of the action that cannot be avoided;  (2) alternatives to the proposed action;  (3)  alternatives to the proposed action;  (4) the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity, and (5)  any irreversible and irretrievable commitment of resources that would be involved.  42 U.S.C. § 4332.  The Council on Environmental Quality ("CEQ") regulations provide detailed guidance regarding the scope and content of an EIS. 40 C.F.R. pt. 1502.

Act." (AR 4518, 4455). The FWS had made a scientific determination that designation of critical habitat would have no environmental impacts beyond those flowing from the listing decision itself. (AR 4455). This is "because the critical habitat designation is not expected to cause additional habitat restrictions in any [Service] biological opinions issued under the Act . . . ." *Id.*

Even when NEPA applies to designation of critical habitat, there is good reason to believe that it "will rarely, if ever, require the preparation of a full-blown environmental impact statement, . . . ." MICHAEL J. BEAN & MELANIE J. ROWLAND, THE EVOLUTION OF NATIONAL WILDLIFE LAW 210 (3rd ed. 1997)(*citations omitted*).

Furthermore, Plaintiffs' arguments as to the purported economic impacts of the designation on the livestock ranching community are extremely weak: "The designation *may* lead to the disintegration of the history, culture, and economy of communities associated with or dependent on livestock grazing, with consequent social and health effects in both the local and regional contexts. ..."Pls. Opening Brief at 27 (emphasis added).

It is significant that these types of effects are not intended by themselves to require preparation of an EIS. 40 C.F.R. § 1508.14. *See also, Image of Greater San Antonio, Tex. v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978)("when the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligation to prepare an EIS").

Finally, I note that this conflict over the FWS's scientific determination that designation of critical habitat would have no environmental impacts beyond those flowing from the listing decision itself is a factual dispute. The resolution of this factual dispute implicates substantial agency expertise and requires a high level of technical expertise. *Greenpeace Action v. Franklin,*

14 F.3d 1324, 1330 (9th Cir. 1992)(*quoting Marsh v. Oregon Natural Resources Council*, 490

U.S. 360, 376 (1989). The FWS's decision that the proposed action does not warrant an EIS

necessarily involves substantial agency expertise as to the biological requirements of the SWF. I

will not overturn this decision based upon Plaintiffs' insufficient challenge thereto, which lacks

evidence of a primary impact on the physical environment.

NEPA does not mandate a particular outcome and a court reviewing an agency's decision

should not "substitute its judgment for that of an agency," rather, the court's role is to ensure the

agency took the requisite "hard look"[13] at the environmental consequences. *Kleppe v. Sierra

Club,* 427 U.S. 390, 410 n.21 (1976); *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213

(10th Cir. 1997). This requires this Court to carefully review the record to ascertain whether the

agency decision is "founded on a reasoned evaluation 'of the relevant factors.' " *Marsh*, 490 U.S.

at 373-74, 378 (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

(1971)). This inquiry into the facts is to be searching and careful. *Overton Park* at 416. But

"[w]hen specialists express conflicting views, an agency must have discretion to rely on the

reasonable opinions of its own qualified experts even if, as an original matter, a court might find

contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360,

378 (1989). Once I am satisfied that an agency's exercise of discretion is truly informed, as is the

case here, I must defer to that informed decision. *Id*. at 377.

---

[13] This doctrine found its origin in *Greater Boston Television Corp. v. Federal Communications Commission*, 444 F.2d 841, 851 (D.C. Cir. 1970), *cert denied*, 401 U.S. 950 (1972): "Its supervisory function calls on the court to intervene not merely in the case of procedural inadequacies, or by passing the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, and has not genuinely engaged in reason decision making."

**Conclusion**

I conclude that the FWS properly evaluated economic impacts in an incremental manner from those associated with listing, as is required under the ESA and that the Service also correctly determined that, for the SWF, there were no economic impacts solely attributable to designation of critical habitat, because its scarce habitat was already protected for the conservation and recovery of the species. With regard to Plaintiffs' NEPA claims, I conclude that the scope of the NEPA review that FWS conducted was adequate in consideration of the impact of the designation. Finally, I conclude that the critical habitat designation was well-grounded in the record and supported by the best available information.

**WHEREFORE,**

**IT IS HEREBY ORDERED THAT** for the reasons herein, Plaintiffs have standing and Plaintiffs' Motion to Strike Standing Argument, or in the Alternative, Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Standing (Docket No. 46), shall be **granted.**

**IT IS FURTHER ORDERED THAT** two related motions, Federal Defendants' Motion and Memorandum to Strike Plaintiffs' April 15, 1999 Extraneous Legal Argument and Exhibits Thereto (Docket No. 65) and Plaintiff's Motion to Strike Declaration of Jamie Rappaport Clark and Attachments Thereto (Docket No. 48), shall be **denied**.

**IT IS FURTHER ORDERED THAT,** the actions of the United States Fish and Wildlife Service do not violate the Endangered Species Act, the National Environmental Policy Act or the Administrative Procedures Act, and that these actions shall be upheld and **affirmed** and that this case shall be **dismissed**.

**IT IS FURTHER ORDERED** that a Final Judgment will be filed contemporaneously and

in conformity with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**